UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOANN MARACLE,

             Plaintiff,

v.

**DECISION AND ORDER**

18-CV-00156

ANDREW M. SAUL,
COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____

This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of defendant Andrew M. Saul, the Commissioner of Social Security,[1] that plaintiff was not entitled to Social Security benefits. The parties have consented to the jurisdiction of a Magistrate Judge [22].[2] Before me are the parties' cross-motions for judgment on the pleadings [16,19]. Having reviewed the parties' submissions [16, 19, 21], I order that this case be remanded to the Acting Commissioner for further proceedings.

**BACKGROUND**

Plaintiff applied for Social Security Disability ("DIB") benefits in October 2014 (R. 163)[3] and for Supplemental Security Income ("SSI") benefits in April 2015 (R. 166), alleging a disability as of October 1, 2014 due to injuries sustained when a box fell on her at work on June 18, 2013 (R. 263) and as the result of a car accident on October 14, 2013. (R. 45, 311). She

---

[1] *See* Reddinger v. Saul, 2019 WL 2511379, *9 n. 1 (D. Conn. 2019) ("on June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Carolyn Colvin was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Carolyn Colvin as the named defendant. See Fed. R. Civ. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above").

[2] Bracketed references are to the CM/ECF docket entries.

[3] References denoted as "R." are to the administrative record [8]. Unless otherwise indicated, page references are to numbers located on the bottom of the document pages.

asserts that her injuries were exacerbated when she fell in October 2014 (R. 344). After plaintiff's claim for benefits was initially denied, an administrative hearing was held on November 2, 2016 before Administrative Law Judge ("ALJ") George Hamel (R. 39). ALJ Hamel issued a decision denying benefits on November 30, 2016 (R. 8). The Appeals Council denied plaintiff's request for review, and plaintiff thereafter commenced this action.

Plaintiff was injured when a box fell on her while she was working on June 18, 2013 (R. 263). As a result, she experienced pain in her right wrist radiating into her arm and shoulder (R. 379). Examinations and imaging did not reveal any visible abnormality, loss of sensation or decrease in range of motion (R. 362). At least initially, plaintiff was diagnosed with wrist sprain and carpal tunnel syndrome (R. 381). A subsequent MRI ruled out carpal tunnel syndrome (R. 264). Upon examination. Dr. Marc Frost, a neurologist, noted that plaintiff's strength in her right upper extremity was variable and would "give way . . . with all movements of muscle groups apparently due to pain" (R. 300). Dr. Frost did note that plaintiff was observed using her right hand "quite normal" at the end of the examination. Id.

The only abnormality revealed during an electromyography ("EMG") on August 20, 2013 was a central hypoactive lesion (R. 264). There was no evidence of right lumbosacral or cervical radiculopathy, polyneuropathy or extremity mononeuropathy (R. 264, 297). On August 26, 2013, plaintiff was examined by Dr. Kevin Lanighan, an orthopedic surgeon, who stated that plaintiff did not require surgical intervention and that she may have RSD (R. 264).[4] He stated that she should seek care from a pain management specialist. Id.

---

[4]  RSD is short for Reflex Sympathetic Dystrophy, also known as Complex Regional Pain Syndrome (CRPS). "RSDS/CRPS patients typically report persistent, burning, aching or searing pain that is initially localized to the site of the injury. The involved area usually has increased sensitivity to touch. The degree of reported pain is often out of proportion to the severity of the precipitating injury. Without appropriate treatment, the pain and associated atrophic skin and bone changes may spread to involve an entire limb. Cases have been reported to progress and spread to other limbs, or to remote parts of the body." Welch v. Colvin, 2015 WL 4940666, *2 (S.D. Miss. 2015).

On August 30, 2013, plaintiff started treatment with Dr. Jerry J. Tracy III, a pain management specialist (R. 428). He noted her complaints of pain in her right wrist radiating up her arm, through the trapezius into her neck, in addition to numbness and tingling in her fingers and diminished grip strength in her right hand. Id. Upon examination, Dr. Tracy found the "muscle strength and tone wrist flexion and extension, bicep election, and grasp" with respect to plaintiff's right upper extremity to be "3-4/5+", as opposed to her left upper extremity strength which was "5/5+" (R. 431). He assessed plaintiff as suffering from tensosynovitis in her right wrist, "pain joint shoulder region", neuralgia neuritis and radiculitis unspecified, myofascial pain syndrome, and depressive disorder (R. 432). He prescribed a lidocaine based cream and Cymbalta, along with additional testing. Id. Dr. Tracy opined that plaintiff was "temporarily markedly disabled", and assessed the percentage of her temporary impairment at 75% (R. 432-33).

Further diagnostic testing did not identify a clinical basis for the pain and numbness reported by plaintiff (R. 295). Examinations did reveal decreased range of motion, tenderness and pain in her right shoulder, as well as "tenderness and bony tenderness" (but a normal range of motion, no swelling or deformity) in her right wrist (R. 488).

On October 17, 2013, plaintiff was seen by Dr. Gregory J. Castiglia, an orthopedic surgeon (R. 310). He noted that plaintiff stated that she had been in an automobile accident on October 14, 2013 which exacerbated the symptoms in her arm and neck (R. 311). Plaintiff reported that she was "very sensitive" to any direct pressure across her wrist. Id. He also noted that plaintiff was experiencing "pins and needles traveling down [her] right leg and soreness in the right ankle area. Id. Upon examination, Dr. Castiglia noted that plaintiff was "in obvious discomfort" and had "marked hesitation with rapid alternating movements on the right hand" (R. 312). He found that there was pain with flexion and extension of the right wrist and

diminished pinprick sensation in the right foot. Id. Dr. Castiglia opined that plaintiff had a 100% temporary impairment. Id. He assessed plaintiff's situation as follows:

> "Her symptoms appear to be directly related to her Workers' Compensation injury dating back to June 2013. She had a mild exacerbation of her pain symptoms following the auto accident on 10/14/13. At this point, [plaintiff] is unable to work. She is placed at a temporary total disability level. We will start her on Nerurontin 300 mg. twice a day and I placed her on a Medrol Dose pack to see if this helps to relieve some of the inflammation particularly in the right arm." (R. 313).

An MRI performed on October 23, 2013 revealed "C4-C5 level midline disc herniation indenting the thecal sac and touching but not indenting the spinal cord", as well has a C5-C6 level midline disc herniation indenting the thecal sac (R. 319). An MRI of her lumbar spine revealed mild disc bulging at T12-L1 and L4-L5, with arachnoid cysts in the sacral region (R. 318). Upon examining plaintiff again on November 13, 2013, Dr. Castiglia found the plaintiff had slightly limited range of motion of the cervical spine in all planes due to stiffness and pain, tenderness to palpation in the posterior cervical spine and paraspinal muscles, and that her right wrist was in a splint (R. 322). He noted the plaintiff "is experiencing persistent neck spasms as well as suboccipital headaches". Id. He stated that plaintiff may benefit from possible trigger point injections, but that neurosurgical intervention was not indicated at that time (R. 323). He continued her on Neurontin. Id. On that same day, Dr. Castiglia wrote a letter opining that plaintiff was to "remain totally disabled" until January 13, 2014, and was to be reevaluated on January 8, 2014 (R. 320). Plaintiff received wrist injections and thoracic facet injections from Dr. Tracy starting on November 26, 2013 (R. 442, 444, 446).

On December 2, 2013, Dr. Tracy completed a residual functional capacity evaluation stating that plaintiff's disability was permanent (R. 305). He opined that plaintiff should avoid carrying, pushing/pulling, climbing and driving; and that she had "some limitation"

with respect to lifting, walking, standing, stooping/bending, sitting, and bus travel. Id. Dr. Tracy also stated that plaintiff was to have "no repetitive upper extremities activity" (R. 306).

Plaintiff's wrist, shoulder, cervical and lumbar spine issues continued through 2014. Upon examination on February 12, 2014, Dr. Castiglia noted that plaintiff had tenderness to palpation of the lumbar spine and paraspinal muscles, and that she had difficulty with range of motion of the lumbar spine in flexion and extension due to stiffness and pain (R. 330). Her right quadriceps strength was slightly diminished at 4/5, and she had diminished sensation in her right foot and the distal aspect of her right leg. Id.

On April 23, 2014, Dr. Eugene J. Gosy, a pain management specialist, stated that plaintiff had not done well with Hydrocodone in conjunction with Gabapentin (R. 449). Upon examination, he found that her shoulder abduction was limited at 75 degrees (R. 451). Dr. Gosy switched plaintiff's analgesic to Butrans, and continued her on Neurontin. Id. He opined that plaintiff was 66 percent disabled. Id. On May 6, 2014, Dr. Tracy, Dr. Gosy's partner, made similar clinical findings regarding plaintiff's range of motion, but determined that she was temporarily "totally disabled" (R. 455).

An EMG and nerve conduction study performed on plaintiff's right upper extremity on June 18, 2014 revealed "a decrease in amplitude of the right median nerve which may be partially technical due to poor tolerability for maximum stimulation of the right median motor nerve. This may also represent a suggestion of cervical radiculopathy. . . . There was a generalized decrease in recruitment of all muscles on needle EMG study. This was due to pain during muscle contraction and not from any identifiable neurologic pathology" (R. 424).

Dr. Gosy made similar clinical findings on July 9, 2014 (R. 458-60) and August 21, 2014 (R. 462-65), and on both occasions stated that plaintiff was 50 percent disabled. Plaintiff's back pain increased after she fell while walking up stairs at home in October 2014 (R.

344). Zofran was added to her prescription regimen for persistent nausea (R. 345). An MRI of plaintiff's lumbar spine on October 16, 2014 showed "prominent sacral cysts present extending on the left side into the neural foreman" (R. 347). On December 8, 2014, Dr. Gosy found that plaintiff's shoulder abduction had decreased further to 60 degrees (R. 636). In this report, Dr. Gosy assessed plaintiff's impairment at 75 percent on one occasion (R. 638) and at 66 percent on another occasion (R. 639).

A functional capacity evaluation dated January 7, 2015, conducted by Mary R. Orrange, a Registered Occupational Therapist at Buffalo Ergonomics, stated that plaintiff had a mild limitation in static sitting and balance, a moderate limitation in activities such as extended reaching, rotation, standing, walking, and a major limitation in stair climbing (R. 643). She also found that plaintiff had below average right grip/pinch strength, as well as below average left pinch strength. Id.

Dr. David F. Ratliff began treating plaintiff in November 2013 (R. 648). On February 9, 2015 Dr. Ratliff noted that plaintiff was "extremely uncomfortable during the exam and writhing due to the pain" (R. 662). He stated that she "is currently unable to perform even sedentary level work", but suggested that with some accommodations and a change of professions, she might be able to perform sedentary work (R. 663). He stated that plaintiff "is at a minimum of 75% disabled, as confirmed by the functional capacity evaluation". Id.[5] On February 25, 2015, Dr. Ratliff completed his own RFC evaluation of plaintiff, stating that plaintiff had no limitations with respect to her ability to sit stand or walk, but that she could not utilize her right arm for work and thus was limited in her ability to lift and carry, or push and pull

---

[5] Dr. Ratliff appears to be referring to the RFC performed by OT Orrange in January 2015 (R. 662).

(R. 654). Although Dr. Ratliff determined that plaintiff's pain was out of proportion with clinical findings, he stated that this was likely due to CRPS (R. 653).

On February 16, 2015, plaintiff was examined by Dr. Geoffrey Gerow, a chiropractor (R. 860). Upon examination, he stated that plaintiff was "rather distraught and [was] periodically crying" (R. 681). He found that her range of motion in her cervical spine was compromised. The flexion in her cervical spine was 32% ("normal" being 50%)[6], her left rotation was 20% (80%), right rotation 25% (80%), left lateral bending was 10% (45%), right lateral bending was 15% (45%) and extension was 22% (60%). Id. Plaintiff reported cervicothoracic pain during extension. Id. Reflex testing on her left biceps and triceps was two out of four. Id. Plaintiff refused reflex testing on her right side due to pain. Id.

The range of motion of her lumbar spine was also found to be compromised. Flexion in her lumbar spine was 31% (60%), left lateral bending was 8% (25%), right lateral bending was 9% (25%) and extension was only 1% (25%). Id. Plaintiff reported pain and dizziness upon the testing. Id. The muscle strength in her right wrist was three out of five (R. 862). The grip strength was measured to be 10 pounds in her dominant right hand, and 25 pounds in her left hand. Id. Dr. Gerow found that "[o]n digital palpation 18/18 spots commonly associated with fibromyalgia were positive." Id. Plaintiff was unable to toe walk. Id. Straight leg raising was 20% bilaterally with report of pain. Id. Posterior to anterior compression produced reported pain over the entire spine, and a muscle spasm was noted over the cervicothoracic and lumbosacral regions paraspinally. Id. Dr. Gerow concluded that plaintiff suffered from lumbar disc herniations, lumbar intersegmental dysfunction, cervical intersegmental dysfunction,

---

[6] Dr. Gerow stated that ranges of motion were measured by Dual Inclinometry and that his finding were compared to "normal" from the AMA Guides to the Evaluation of Permanent Impairment 5th Edition (R. 861).

cervical disc herniations, and cervical subluxations identified by exam/observation. Id. He considered plaintiff to have "a marked partial, 75% impairment" (R. 862-63).

An MRI of plaintiff's right shoulder on February 20, 2015 revealed a "SLAP tear extending to the biceps anchor with detachment", as well as a "[p]artial tear of the intra-articular segment of the long head biceps tendon which is markedly thickened, demonstrates hypertensives T2 signal with deformity of fibers" (R. 675). In addition, there is a small partial-thickness, under-surface tear of the supraspinatus tendon at the humoral insertion. Id.

In a functional capacity evaluation dated March 22, 2015, Dr. Gosy stated that the pain in plaintiff's back, neck and shoulder were permanent (R. 677). He opined that plaintiff had no ability to lift over 10 pounds, and had "no repetitive use of [her] arms" (R. 678). He also found that her ability to push, pull, bend, climb stairs, or function in a work setting at a consistent pace was "very limited". Id. Dr. Gosy stated that plaintiff was moderately limited in her ability to walk, stand, sit. Id. He concluded that plaintiff was "unable to work full time in [a] sedentary position". Id.

Plaintiff was evaluated by Dr. William Wind, an orthopedic surgeon, to determine whether surgery would be appropriate to correct plaintiff's right shoulder injury (R. 878). He recommended physical therapy (R. 879) and intra-articular injections (R. 886). On April 16, 2015, Dr. Wind stated that plaintiff did not have an impairment (R. 879). On August 18, 2016, Dr. Wind assessed plaintiff's temporary impairment to be "25%" (R. 887).

On December 16, 2015, Dr. Cheryle Hart completed a residual functional capacity assessment (R. 681). Like Dr. Gosy, she opined that plaintiff's neck, back and arm pain due to her work injury, car accident and slip and fall was permanent. Id. Dr. Hart did not make any specific functional findings, but instead concluded that plaintiff was "100% totally impaired" (R. 682).

In 2015 and 2016, plaintiff continued to see Dr. Hart and Dr. Mikhail Strut for pain management, including intra-ligamentous injections (R. 721-48). Upon examination, on various occasions, plaintiff appeared straightforward, tearful, and anxious" (R. 692, 701, 707), "in distress related to pain and functional limitations" (R. 697, 711, 714, 725, 746), and "in acute distress (R. 730, 736, 742). She was observed to have "poor body mechanics with hyperkyphotic posture, rounded shoulders, and straightening of the lumbosacral lordosis" (R. 726). She was found to have "a rounded, hyperextended neck, and forward position of the head". Id. A Spurling test to determine foraminal encroachment was positive. Id. Throughout her treatment with Dr. Hart and Dr. Strut in 2016, plaintiff was found to have decreased range of motion (consistent with the findings by Dr. Gerow), as well as pain upon palpation in her cervical and lumbar areas (R. 692-93, 697, 702, 707-708, 722, 726, 730-31, 736-37, 742-43, 747). On February 29, 2016, Dr. Hart found that plaintiff was "unable to work at this time" (R. 694, 704, 710, 744). On March 25, 2016, Dr. Hart stated that plaintiff's "current whole body function is deemed temporarily totally impaired" (R. 738). She repeated this assessment on April 12, 2016 (R. 733).

In July and August 2016, plaintiff was treated for pain management by Dr. Pratibha Bansal (R. 750-72).[7] Similar to the findings of Dr. Hart and Dr. Gerow, Dr. Bansal noted that plaintiff's cervical spine showed tenderness upon palpation, and that her range of motion was decreased (R. 753). Dr. Bansal opined that plaintiff was 50% temporarily impaired (R. 761).

ALJ Hamel determined that plaintiff suffered from severe impairments, including cervical and lumbar disc disease, right shoulder tendinitis with superior labrum anterior and posterior [SLAP] tear, and acromioclavicular [AC] joint arthritis (R. 19). Nevertheless, he

---

[7] The record reflects that plaintiff had insurance issues which forced her to stop treatment with Dr. Hart and Dr. Strut (R. 750, 893).

concluded that she could perform light work "except that she can only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders or similar devices or work in hazardous environments such as at heights or around dangerous machinery. She can use her bilateral arms and hands for frequent, but not constant, handling and reaching, but can only use her right upper extremity for occasional reaching in all directions" (R.22).

## DISCUSSION

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error". Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

An adjudicator determining a claim for Social Security benefits employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The plaintiff bears the burden with respect to steps one through four, while the Commissioner has the burden at step five. Talavera v. Astrue, 697 F.3d 145, 151 (2d. Cir. 2012).

### B. Did the ALJ Fail to Properly Consider the Opinions of Plaintiff's Treating Physicians?

Plaintiff argues that ALJ Hamel did not properly consider the opinions of her treating physicians. Plaintiff's Memorandum [6-1], p. 31. In arriving at his conclusion that plaintiff could perform light work, ALJ Hamel rejected the various opinions of plaintiff's treating physicians as to the debilitating nature of her impairments. After restating the opinions

of Dr. Tracy, Dr. Gosy and OT Orrange, ALJ Hamel dismisses these opinions as "inconsistent with the overall evidence" (R. 27).[8] He also stated that the assessment of Dr. Tracy was not supported by a function by function analysis of plaintiff's work related restrictions. Id. ALJ Hamel rejected the opinion of Dr. Ratliff because he saw plaintiff on only four occasions, his opinion was based upon plaintiff's subjective complaints, and his opinion was inconsistent with the overall record (R. 29). Finally, he summarily rejected the opinions as to the extent of plaintiff's disability rendered by Dr. Castiglia, Dr. Bauer, Dr. Gerow, Dr. Wind, Dr. Hart and Dr. Bansal by stating that such determinations were "reserved to the Commissioner" without further factual analysis (R. 30).

The opinion of a treating physician is entitled to controlling weight so long as it is consistent with the other substantial evidence. Halloran v. Barnhart, 362 F.3d 28, 32 (2nd Cir. 2004) (*per curiam*); 20 C.F.R. §404.1527(c)(2). When an ALJ discredits the opinion of a treating physician, the regulations direct the ALJ to "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion". 20 C.F.R. §404.1527(c)(2); Snell, 177 F.3d at 134.

The ALJ first must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. Halloran, 362 F.3d 28, 32; *see also* 20 C.F.R. §§404.1527(c)(2)-(6). The Second Circuit has advised that the courts should not

---

[8]   He similarly rejects the consulting opinion of Dr. Donna Miller who opined that plaintiff had moderate limitations for heavy lifting, bending, pushing, and pulling (R. 579).

"hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion". Halloran, 362 F.3d at 33.

ALJ Hamel did not adequately consider the various opinions of plaintiff's treating physicians. With one exception, he did not address the factors set forth in Halloran when assessing the various physician's opinions. He does note that he rejected Dr. Ratliff's opinion because he only examined plaintiff on four occasions (R. 29).[9] While he states generally that the various opinions are inconsistent with the overall record (R. 27), he points to no actual inconsistency. As discussed above, the findings and opinions of Dr. Tracy, Dr. Gosy, Dr. Hart, Dr. Ratliff, OT Orrange and Dr. Gerow are substantially consistent with each other. The opinions of these physicians are also consistent with objective findings revealing multiple herniations in plaintiff's cervical spine (R. 319), diminished grip and muscle strength (R. 428, 431), diminished pinprick in her right foot (R. 312), decreased range of motion in her cervical and lumbar regions (R. 681, 692, 697, 702, 707, 722, 726, 730, 736, 742, 747, 753), a right shoulder "SLAP tear extending to the biceps anchor with detachment" and tears in her biceps and supraspinatus tendons (R. 675), as well as diagnoses of RSD or CRPS (R. 264, 653).

Although ALJ Hamel rejected the opinion of Dr. Tracy because it was not supported by a function-by-function analysis, the record reflects that Dr. Tracy did, in fact, provide such an analysis (R. 305). While ALJ Hamel rejected Dr. Ratliff's opinion because it was purportedly made solely upon plaintiff's subjective complaints, the record reflects that Dr. Ratliff made clinical findings regarding plaintiff's range of motion upon his examination (R. 662). ALJ Hamel summarily rejected the opinion of Dr. Castiglia without addressing his clinical findings of diminished pinprick, decreased cervical range of motion, and "marked hesitation with

---

[9] This factor did not prevent ALJ Hamel from relying on the opinion of Dr. M. Marks (R. 29) who never examined plaintiff, and whose opinion was rendered on December 22, 2014 (R. 71) – prior to much of the medical evidence contained in the record.

- 12 -

rapid alternative movements on the right hand" (R. 312, 322). Such a generalized and inaccurate representations of the record do not present "good reasons" for the dismissal of a treating physician's opinion.

Plaintiff also argues that ALJ Hamel impermissibly based his RFC finding upon his own lay opinion. [16-1], 36. In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole". Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013). An ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision". Id. However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings". Ortiz v. Colvin, 298 F.Supp.3d 581, 586 (W.D.N.Y. 2018) (quotation omitted). In other words:

> "[a]n ALJ is prohibited from 'playing doctor' in the sense that 'an ALJ may not substitute his own judgment for competent medical opinion. . . . This rule is most often employed in the context of the RFC determination when the claimant argues either that the RFC is not supported by substantial evidence or that the ALJ has erred by failing to develop the record with a medical opinion on the RFC."

Quinto v. Berryhill, 2017 WL 6017931, *12 (D. Conn. 2017). "[A]s a result[,] an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence". Dennis v. Colvin, 195 F.Supp.3d 469, 474 (W.D.N.Y. 2016). Here, having expressly discounted the opinions of plaintiff's treating physicians, ALJ Hamel fails to identify any medical opinion which serves as the basis for his RFC finding. I find that this claim must be remanded for further administrative proceedings, so that the opinions of plaintiff's treating physicians can be properly assessed. As a necessary component of that analysis, the Commissioner shall ensure that the RFC determination not be based upon a lay opinion.

Because ALJ Hamel failed to properly assess the opinions of plaintiff's various treating physicians under the Halloran criteria, his determination is not supported by substantial evidence.

## CONCLUSION

For these reasons, Plaintiff's motion for judgment on the pleadings [16] is granted to the extent that this case is remanded for further proceedings, consistent with the issues discussed above, and the Commissioner's motion for judgment on the pleadings [19] is denied.

Dated: September 12, 2019

    /s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge